[No. S048669. Dec. 5, 1996.]

JON E. NEWMAN et al., Plaintiffs and Appellants, v.
WELLS FARGO BANK, N.A. as Trustee, etc., et al., Defendants and
Respondents.

**COUNSEL**

Rebecca Coufal, Michael D. Kinkley, Michael Tracy and Dan Johnson for Plaintiffs and Appellants.

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Ethan P. Schulman, Janet L. Evans and Beth L. Kramer for Defendants and Respondents.

## OPINION

**BAXTER, J.**—We are asked to decide whether, in looking to the law of intestacy as a guide to a testator's presumed intent when a will provision is ambiguous, a court should consider the law in effect at the time the will or testamentary trust was executed to determine if a child adopted out of a designated ancestor's family is among the "issue" and "children" the testator intended to benefit, or should apply the law in effect at the death of the ancestor through whom the child may take. Appellant, minor A., a creditor of Jon E. Newman, claims that even though Newman was adopted by Newman's stepfather in 1946, he remains a "child" of Earl Mitchell, his natural father, within the meaning of the will of Helen Lathrop, Mitchell's sister, and is entitled to share in a testamentary trust created for the benefit of Mitchell who is now deceased, Mitchell's siblings, and their children.

Lathrop executed her will and died in 1972. Appellant relies on a 1985 change in the law of intestate succession which permits "adopted-out" children to take if adopted by a stepparent. Other beneficiaries of the trust contend that the law in effect when Lathrop executed the will and when she died applies, as that law presumably will carry out her intent.

The Court of Appeal applied the law governing intestate succession rights of adopted-out children which was in effect at the time Newman's natural father died in 1993 and held that Newman was a beneficiary notwithstanding the adoption. We conclude that, since Lathrop did not express a contrary intention in the will, the court must look to former Probate Code section 257, the statute applicable both at the time Helen Lathrop executed her will and at the time of her death, to ascertain her presumptive intent. We, therefore, reverse the judgment of the Court of Appeal.

I

*Background*

Helen Lathrop, a resident of Belvedere, California, died in December 1972. Her will, dated November 3, 1972, left the residue of her estate to a testamentary trust under which the income was to be paid to her six brothers and sisters, or on the death of any of them to that person's living "issue" by right of representation. On the death of the last of the siblings, the trust estate was to be distributed per capita to the then living children of the siblings. The will was admitted to probate in the Marin County Superior Court early in 1973, and the residue of the Lathrop estate was ordered distributed to Wells Fargo Bank, as trustee of the testamentary trust, in May

1974. The trust, whose provisions parallel those of Lathrop's will, is administered by the trustee under the supervision of the San Francisco Superior Court.

Jon E. Newman's natural father, Earl Mitchell, a brother of Helen Lathrop and an income beneficiary of the trust, died in 1993. Jon E. Newman had been adopted by his stepfather in 1946. In August 1993, the guardian ad litem of minor A. petitioned the superior court for an order attaching 25 percent of Jon E. Newman's share of the income of the Lathrop trust. The petition alleged that Newman was the defendant in an action pending in the State of Washington, that the guardian and Newman had entered into a settlement agreement that had been approved by the court, and that "John [*sic*] E. Newman has agreed to stipulate to an order of the California court to attach 25% of his share of the income of the Lathrop Trust."[1] The petition was granted on November 1, 1993, but thereafter Wells Fargo Bank, as trustee, filed a petition for advice and instructions pursuant to Probate Code section 17200.[2] The Wells Fargo petition alleges that Newman had been adopted by his stepfather, W. E. Newman, in 1946, and asks if Newman was "issue of" Earl Mitchell at the time of Mitchell's death. The petition also sought advice regarding the distribution to Newman of that part of the trust income that had been going to Mitchell. The apparent trust beneficiaries, including Newman, as well as the guardian of minor A., were given notice. Several other income beneficiaries subsequently filed declarations that they had not received notice of the earlier proceeding, and they appeared in the trustee's proceeding.

On June 28, 1994, the superior court made the order from which this appeal was taken, ruling that under former Probate Code section 257, the law in effect in 1972 when Helen Lathrop executed her will, and *Estate of Russell* (1971) 17 Cal.App.3d 758 [95 Cal.Rptr. 88] (*Russell*), Newman was not the child of Earl Mitchell for any purpose, and that there being no contrary expression of intent in the Lathrop trust, Lathrop was found to have intended the terms of the trust to be interpreted in a manner consistent with California law as it stood when the will was executed.[3] The court ruled that subsequent changes (§ 6451 [added by Stats. 1993, ch. 529, § 5]; former § 6408 [added by Stats. 1990, ch. 79, § 14, p. 721 and repealed by Stats. 1993, ch. 529,

---

[1] A copy of the order approving the settlement recites, inter alia, that the guardian of minor A. was authorized to accept on behalf of the minor an agreed judgment of $175,000 on condition that Newman execute an irrevocable assignment of the proceeds of the distribution of the Lathrop trust and stipulate to an order to attach 25 percent of Newman's share of the income of the trust.

[2] All undesignated statutory references are to the Probate Code.

[3] References herein to the former Probate Code are to the Probate Code in effect at the time of Lathrop's death. References to former sections are to those sections no longer in effect.

§ 4]) did not affect that interpretation since they were expressly inapplicable under the terms of section 6103.[4] The court then found that Newman is not a beneficiary of the trust and directed that the trustee make no distributions from the trust to or for the benefit of Newman or any creditor of Newman. In so doing, the court noted that it had not previously adjudicated the issue of whether Newman was a beneficiary of the trust, and that no notice of the earlier petition had been given to the trust beneficiaries. Newman and minor A. filed a notice of appeal. Minor A. is the only party claiming a share of the trust through Earl Mitchell who appeared in the Court of Appeal.[5]

Appellant conceded that under former Probate Code section 257, from 1955 to 1985, an adopted person did not succeed to the estate of the person's natural parents under the law governing intestacy. He argued that since 1985, the law, which in 1993 was set out in former section 6408, subdivision (b), provided that Newman should succeed to Mitchell's interest in the Lathrop trust, as that law presumably reflected Lathrop's intent when she left income interests to "issue" and the remainder to "children" of her siblings. The Court of Appeal agreed. Turning to rules of construction it believed

---

[4]Section 6103 provides that various Probate Code provisions do not apply if a testator died before January 1, 1985, and that the former law applies instead. It does not affect present section 6451 or former section 6408, but section 6414, subdivision (a) is to the same effect and expressly applies.

[5]The notice of appeal, which recites that "JON E. NEWMAN, Claimant, and minor 'A' (judgment creditor of Jon E. Newman) appeal," was signed by Michael D. Kinkley, attorney for minor A., by an attorney for "John Mitchell" who is identified in the appellant's opening brief in the Court of Appeal as a "Lathrop trust claimant," and by Dan B. Johnson, the guardian ad litem for minor A. John Mitchell, John Mitchell Newman, and Kinkley were not parties of record in the superior court action although the Washington order directed that a portion of minor A.'s recovery from Newman's share of the trust be paid to Kinkley.

Under California law, as a general rule only a party of record to the proceedings in the trial court may appeal. (Code Civ. Proc., § 902; *Garrison* v. *Board of Directors* (1995) 36 Cal.App.4th 1670 [43 Cal.Rptr.2d 214]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 135, p. 145.) While this rule is relaxed for beneficiaries in some probate proceedings, a creditor of an estate (or of a beneficiary), including an attorney creditor (*In re Marriage of Tushinsky* (1988) 203 Cal.App.3d 136 [249 Cal.Rptr. 611]), does not have an interest in the subject matter of the proceeding sufficient to confer standing to appeal unless the person had made himself a party of record. (*Estate of Cross* (1975) 51 Cal.App.3d 80, 88 [123 Cal.Rptr. 825]; *Estate of Partridge* (1968) 261 Cal.App.2d 58, 61 [67 Cal.Rptr. 433]; 9 Witkin, Cal. Procedure, *supra*, Appeal, § 138, p. 148.) The rule is the same with respect to trusts. Here, the notice of appeal is on behalf of Jon E. Newman and minor A. only, notwithstanding the signature of counsel for "John" Mitchell. Johnson, as guardian of minor A., was given notice and apparently became a party of record by filing papers, through counsel Kinkley, in the superior court proceedings.

Inasmuch as Jon E. Newman did not file a brief in the Court of Appeal and has apparently abandoned the appeal, the only party properly before this court is minor A. When it was discovered that Kinkley, a member of the bar of the State of Washington, is not an appellant, he sought and was granted pro hac vice status and continues to represent Johnson as guardian for minor A. (See Cal. Rules of Court, rule 983.)

applicable, that court observed that Lathrop was presumptively aware that the laws governing inheritance rights of adopted children might change after her death; that this presumption was strengthened by the fact that the laws governing inheritance had been amended drastically during her lifetime; that she had used a designated ancestor, life estate, and the words "then living" as prerequisites for the gifts; and that her will expressed an intent to benefit the children of each of her siblings. These observations led the Court of Appeal to conclude that whether Newman was "issue" of Mitchell within the meaning of the trust had to be decided under the law in effect when Newman's father died in 1993, and not the law in effect in 1972 when Lathrop died. The court therefore reversed the order of the superior court and remanded for further findings on whether Newman was the issue of Mitchell under that statute.

Respondents, four income beneficiaries of the trust to whom a portion of the corpus will be distributed upon the death of the last sibling, contend that the rules of construction on which the Court of Appeal relied govern the timing and vesting of class gifts, but are not applicable to defining testamentary terms such as "issue." The result, they argue, is inconsistent with controlling precedent, which holds that the adoption statutes and policies prevailing at the time a will is executed determine who is included in a class gift to "issue" or "children." They also note that the Legislature expressly provided that the statute under which the Court of Appeal decided that Newman should be treated as issue of Mitchell did not apply to the estates of decedents who died before January 1, 1985.

## II

### *Discussion*

Former Probate Code section 257 provided from 1955 through 1985 (Stats. 1955, ch. 1478, § 1, p. 2690): "An adopted child shall be deemed a descendant of one who has adopted him, the same as a natural child, for all purposes of succession by, from or through the adopting parent the same as a natural parent. An adopted child does not succeed to the estate of a natural parent when the relationship between them has been severed by adoption, nor does such natural parent succeed to the estate of such adopted child, nor does such adopted child succeed to the estate of a relative of the natural parent, nor does any relative of the natural parent succeed to the estate of an adopted child."

Effective January 1, 1985, provisions of the former Probate Code, including former section 257 were repealed (Stats. 1983, ch. 842, § 19, p. 3024)

and replaced by new provisions, containing former section 6408 (Stats. 1983, ch. 842, § 55, p. 3083). The new section permitted the establishment of a parent-child relationship between an adopted person and the person's natural parent under specified circumstances. Former section 6408, subdivision (a) was amended in 1985, and the provisions governing the parent-child relationship between an adopted person and his or her natural parent were placed in a new section, former section 6408.5, subdivision (a). (Stats. 1985, ch. 982, § 21, pp. 3118-3119.) The code, including former section 6408.5, was repealed in 1990 (Stats. 1990, ch. 79, § 13, p. 463) and a new code, containing a new, substantially similar provision as section 6408, was enacted (Stats. 1990, ch. 79, § 14, p. 721).[6]

At the time Newman's natural father died in 1993, subdivision (b) of former section 6408 (former section 6408(b)) provided:

"The relationship of parent and child does not exist between an adopted person and the person's natural parent unless both of the following requirements are satisfied:

"(1) The natural parent and the adopted person lived together at any time as parent and child, or the natural parent was married to, or was cohabiting with, the other natural parent at the time the child was conceived and died before the birth of the child.

"(2) The adoption was by the spouse of either of the natural parents or after the death of either of the natural parents."[7]

Section 6414, subdivision (a), expressly limited application of former section 6408(b) to estates of decedents who died on January 1, 1985, or thereafter. It states: "[T]his part does not apply where the decedent died before January 1, 1985, and the law applicable prior to January 1, 1985, continues to apply where the decedent died before January 1, 1985."[8]

The Court of Appeal did not discuss the impact of section 6414 on its application of former section 6408(b) to the Lathrop trust.

---

[6]This section was repealed in 1993 (Stats. 1993, ch. 529, § 4) and was replaced by section 6451.

[7]The superior court found that Jon E. Newman had been adopted by his stepfather in 1946. The order also recites he had resided with Earl Mitchell before his adoption, but made no finding to that effect. The trustee's petition had alleged on information and belief that Jon had resided with Earl Mitchell until Jon was about four years old.

[8]Only that part of a decedent's estate that is not effectively disposed of by will is governed by the statutory rules of intestate succession. (§ 6400.) Therefore, these statutes are relevant here only to the extent that they may be helpful in construing terms used in the Lathrop will and trust in order to carry out the intent of Helen Lathrop. (*Ibid.*)

The parties agree that the Probate Code provisions governing construction of wills also apply to construction of a decree of distribution of a testamentary trust when the decree parallels that of the will. (See *Estate of Joslyn* (1995) 38 Cal.App.4th 1428 [45 Cal.Rptr.2d 616]; *Estate of Newmark* (1977) 67 Cal.App.3d 350 [136 Cal.Rptr. 628].)

■ "The intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument." (§ 21102, subd. (a).) " 'The paramount rule in the construction of wills, to which all other rules must yield, is that a will is to be construed according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible.' (*Estate of Wilson* (1920) 184 Cal. 63, 66-67 [193 P. 581].) The rule is imbedded in the Probate Code. (§ 101.) Its objective is to ascertain what the testator meant by the language he used." (*Estate of Russell* (1968) 69 Cal.2d 200, 205-206 [70 Cal.Rptr. 561, 444 P.2d 353], fns. omitted.)

■ Where extrinsic evidence is not admissible or available, a reviewing court will independently construe the terms used in a will. (*Estate of Dodge* (1971) 6 Cal.3d 311, 318 [98 Cal.Rptr. 801, 491 P.2d 385]; *Estate of Elkeles* (1979) 90 Cal.App.3d 374, 377 [153 Cal.Rptr. 377].) Only if the terms are ambiguous will the court resort to presumptions which create a legal presumption of intent (*Estate of Newmark, supra,* 67 Cal.App.3d 350, 356), but otherwise unambiguous terms such as "child," "children," or "issue" may be ambiguous in the context of a particular will and the circumstances in which the will was executed. Thus, while these terms are not ambiguous in most cases and the ordinary use of words must be considered (§ 21122; former Prob. Code, § 106), as the enactment of former section 6408 and former Probate Code section 257 suggest, when a child has been adopted into or out of the testator's family, and the will is not specific with regard to the rights of the adopted child, a latent ambiguity exists. (*Estate of Craig* (1944) 64 Cal.App.2d 132 [148 P.2d 100].) Before resorting to legal presumptions, however, as with any written instrument, the court must attempt to ascertain the intent of the testator by examining the will as a whole and the circumstances at the time of its execution. (§ 21121; former Prob. Code, § 103; *Estate of Joslyn, supra,* 38 Cal.App.4th 1428, 1433; see, e.g., *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839].) In so doing, when there is no conflict in extrinsic evidence, the court is not bound by inferences drawn from that evidence by the trial court. (62 Cal.2d at p. 866, fn. 2; *City of Manhattan Beach* v. *Superior Court* (1996) 13 Cal.4th 232, 238 [52 Cal.Rptr.2d 82, 914 P.2d 160].)

A. *The will of Helen M. Lathrop and the circumstances of its execution.*

■ Nothing on the face of the Lathrop will assists in understanding her intent with regard to adopted-out children when she directed that trust

income be paid to the issue of a deceased sibling and that on the death of the last sibling the trust corpus be distributed to the then living children of her siblings.

Lathrop also used the word "issue" in one will provision outside the trust in which real property is left to a husband and wife, or the survivor, or, if both predeceased Lathrop "to their issue, by right of representation." All other specific bequests were conditioned on the devisee surviving Lathrop and none used the terms child, children, or issue. Lathrop also declared that she had no "children or issue of deceased children." However, it seems clear that she used the term "issue" in its commonly understood meaning, i.e., direct descendants of the named beneficiaries or children, grandchildren, etc.

The limitation on ultimate distribution of the trust corpus to the then living "children" of her siblings "per capita," as opposed to her siblings' "issue," reflects an apparent intent that the grandchildren of Lathrop's siblings not take a share of the corpus. The instruction that the children of the siblings take "per capita and not per stirpes" reflects an intent that all of Lathrop's living nieces and nephews take an equal share regardless of what their share of the trust income may have been.[9] None of this is helpful, however, in ascertaining whether Lathrop intended that "issue" and "children" include a nephew who had been adopted by a stepfather before the will was executed and thus at that time was not legally recognized as a "child" of Lathrop's brother Earl Mitchell.

Earl Mitchell was a named beneficiary of the trust created by the will. The adoption of his son Jon E. Newman by Jon's stepfather had occurred in 1946, more than 25 years before the will was executed and Lathrop's death. No extrinsic evidence was offered below to establish whether Lathrop was

[9] In per capita distribution the estate is distributed in equal shares regardless of the taker's proximity of relationship to the deceased. (*Estate of Begley* (1988) 201 Cal.App.3d 791, 195, fn. 1 [247 Cal.Rptr. 632].)

"By right of representation or per stirpes 'means taking the share of an immediate ancestor, who in turn takes the share of his next immediate ancestor and so on until a common ancestor is reached.' " (*Estate of Careaga* (1964) 61 Cal.2d 471, 476 [39 Cal.Rptr. 215, 393 P.2d 415].) "Taking 'per stirpes' denotes that the descendants of a deceased person together take the share which the deceased person would have taken. [Citation.] This is taking by the right of representation. [Citations.] The antithesis of per stirpes is 'per capita.' [Citation.] In a per capita distribution, the property is divided into as many equal shares as there are children or surviving descendants of deceased children, with each child or descendant of a deceased child taking one share. [Citation.] This is taking in an heir's own individual right." (*Estate of Edwards* (1988) 203 Cal.App.3d 1366, 1372 [250 Cal.Rptr. 779].)

Unlike the court's conclusion in *Estate of Careaga, supra,* 61 Cal.2d 471, that "children" and "issue" had the same meaning as used in the decree construed in that case, here the testator made a clear distinction between "children" and "issue" by providing that the former take per capita and the latter per stirpes.

aware of the adoption or whether she intended that children adopted out of the family of a sibling be on an equal footing with the adopted-out child's cousins when either income or remainder distributions from the trust were made. Thus, we find nothing on the face of the will or in the circumstances of its execution to guide us in ascertaining the intent of the testator with respect to the status of Jon E. Newman other than the fact that he had been adopted out at the time the Lathrop will was executed. Also relevant, however, is the fact that Lathrop's will appears to have been prepared by an attorney or other person familiar with the Probate Code. The will is in proper form, includes all standard provisions, uses many technical terms, and one copy in the record bears an "OFFICE COPY" stamp dated on the date the will was executed.

## B. *Presumptions in aid of construction.*

A testator is presumed to be aware of the public policy reflected in the statutory definitions of the terms used in a will at the time the will is executed and to intend that those definitions be followed in construction of the will unless a contrary intent is expressed in the will. This presumption is strongest when an attorney has drafted the will because "[w]here an instrument has been drawn by one skilled in the law, the presence of legal and technical terms is an indication that the legal term of art has been used, and therefore is to be accepted, in accordance with its legal definition. (*Estate of Thompson* [(1931) 18 Cal.App.2d 680 (64 P.2d 984)]; *Maud* v. *Catherwood* (1945) 67 Cal.App.2d 636, 641 [155 P.2d 111].)" (*Wells Fargo Bank* v. *Huse* (1976) 57 Cal.App.3d 927, 932 [129 Cal.Rptr. 522].)

Three California decisions applying these rules to the inheritance rights of adopted persons stated the law and public policy of which Lathrop was presumably aware at the time she executed her will; two of them were decided only the year before her will was made. The earliest, *Estate of Heard* (1957) 49 Cal.2d 514 [319 P.2d 637] (*Heard*), considered the rights of a child adopted *into* the testator's family. In *Heard,* this court looked to former Probate Code section 257 for guidance as to the presumed intent of the testator who left testamentary trust gifts to "issue" of other beneficiaries, and held that a child adopted by the son of the testator after the will was made and the testator had died was the lawful "issue" of the testator's son and entitled to a share of the trust left to such issue. The court explained the relevance of section 257: "We cannot suppose that wills are made in a vacuum; that the status of an adopted child being the same as a biological offspring, which is the public policy of this state, may be completely ignored, or that it was ignored by a testator when making a will any more than he may be said to ignore any other rules of law and public policy. When

he has not said anything about 'adopted' children using that word or the equivalent, the court, in seeking his intent, is in fact endeavoring to ascertain what his wishes would be if adopted children were called particularly to his mind. Lacking that, the court must assume that his will would fit it and be compatible with the general body of the law and public policy. Otherwise the court is left with little if any basis for interpreting the instrument." (49 Cal.2d at p. 522.)

In the next case, *Russell, supra,* 17 Cal.App.3d 758, the Court of Appeal correctly extended the reasoning of *Heard* to determine the rights of a child adopted *out* of a trust beneficiary's family. There, the will created a testamentary trust under the terms of which "children or issue surviving" of beneficiaries received the income share of their ancestor's life estate on his or her death, and were the remaindermen. The will provided that the terms "child," "issue" and "descendants" included children adopted before, but not after, the death of the testator. The question was whether a child born to a recipient of a life estate after the death of the testator, but adopted out before the trust terminated, had any interest in the trust.

The trial court found that the testator was familiar with the status of adopted persons and did not provide for the possibility that a class remainderman would be adopted out of the family. He intended, however, that his will be compatible with the law and public policy in effect at the time the will was executed. On that basis the trial court concluded that any rights the adopted-out child had were dependent on his being the child or issue of the life beneficiary at the time of her death. He was not. Therefore, neither he nor his issue had any interest in the income or corpus of the trust. Relying on *Heard,* the Court of Appeal affirmed: "The public policy alluded to in *Heard* is that which recognizes that adopted children are lineal descendants of their foster [*sic*] parent and are in the line of descent from him by virtue of statutory command, the same as if that line had been established by blood ties. (49 Cal.2d at p. 518.) In this state such policy has been expressed by the Legislature as embodied in the adoption statutes [citations] and in the succession statute providing for the inheritance rights of adopted children (§ 257). (See *Estate of Heard, supra,* 49 Cal.2d 514 at pp. 519-522.)" (*Russell, supra,* 17 Cal.App.3d at pp. 767-768.)

Recognizing that the case presented the converse of *Heard,* the Court of Appeal rejected a claim that former Probate Code section 257 had no application to rights under a testamentary distribution, and held that the effect of section 257 was that there had been a complete severance of the former relationship of the adopted person with his biological relatives. In the eyes of the law, he was no longer their "kindred." (*Russell, supra,* 17

Cal.App.3d at pp. 769-770; see *Estate of Goulart* (1963) 222 Cal.App.2d 808, 820 [35 Cal.Rptr. 465].)

*Estate of Haneberg* (1971) 19 Cal.App.3d 643 [96 Cal.Rptr. 807] (*Haneberg*), the third decision which presumably informed Lathrop's intent, was decided shortly after *Russell*, and also involved children adopted out of a beneficiary's family. *Haneberg* differed, however, as the testator had executed the will and died in 1926 and 1927, respectively, at a time when former Probate Code section 257 provided that while a child adopted out of the family did not inherit from his or her natural parent he or she did take through the natural parent from an ancestor or collateral relative. Applying the presumption that the testator, who "was bound to know the existing statutes affecting testamentary dispositions at the time he executed the will," intended that the natural son of the testator's grandson share in a class gift to the "issue" of the testator's children, even though that child had been adopted by a stepfather. (19 Cal.App.3d at p. 648.)

More recently in *Wells Fargo Bank* v. *Huse, supra,* 57 Cal.App.3d 927, the court applied the presumption that a testator is aware of the law applicable at the time a will is executed and intends that law to govern construction of the will to a trust which failed to specify whether the term "lawful" issue was restricted to natural born issue or included adopted children. As here, there was no extrinsic evidence bearing on the trustor's intent. The court noted that among the circumstances surrounding the execution of a document which may be considered in interpreting it were "relevant statutes, case law and public policy in effect at the time of the execution of the document which, in the absence of a contrary intent, are deemed to become a part of the testamentary scheme (*Estate of Heard* (1957) 49 Cal.2d 514, 521-522 [319 P.2d 637]; *Estate of Stanford* (1957) 49 Cal.2d 120, 138 [315 P.2d 681].)" (57 Cal.App.3d at p. 933.)

■ Contrary to the assumption of appellant, the court is not free to depart from these precedents and presume that the 1985 statutory change under which a child adopted out of a decedent's family by a stepparent may still inherit reflects Lathrop's intent. The Legislature has acknowledged that the law and policy in effect when a person dies is presumed to reflect a decedent's intent with regard to the status of adopted children, including children adopted out of a decedent's family. It did so in section 6414, subdivision (a), which as noted above precludes application of the 1985 change in the law of intestate succession governing the status of adopted-out children to decedents who died before the 1985 change became effective. By creating this limitation on the application of the new policy permitting certain adopted-out children to take by intestate succession, the Legislature

gave persons who did not want their estates distributed in accordance with the new policy the opportunity to change their wills or, if they had not made a will, to make one with provisions addressing the status of an adopted-out child. Since the Legislature is aware that the law of intestate succession is often a referent when the court must construe the terms of a will, the court must respect this legislative limitation on retroactive application of the policy governing the status of children adopted by a stepparent.

Section 6414, subdivision (a) and this court's reasoning in *Heard* therefore compel a conclusion that the law to which the court must look to find the presumed intent of a testator with regard to adopted children is the law in effect when a will is executed.[10] Were we to look to later enacted laws, the result would be inconsistent with the legislative policy reflected in section 6414, subdivision (a) and we would have to assume that a testator who is presumptively aware of the current meaning of the words the testator is using to identify the recipients of his or her bounty in a class gift to children or issue, intends to permit a future Legislature to change the pattern of distribution through a post mortem amendment of the law of intestate succession.

Appellant argues alternatively that because Lathrop made a gift of a future interest to a class, and members of a class are not identified until the death of the designated ancestor, the statute we should apply to identify the persons who take under Lathrop's will is that statute in effect when Earl Mitchell died. The Court of Appeal did so in *Estate of Joslyn, supra,* 38 Cal.App.4th 1428, an adult adoption case, holding that in some cases changes in public policy occurring after the death of the testator may be considered. There, at the time the will was executed, adult adoption was not permitted in California. That policy was changed before distribution of the trust estate to a designated class of beneficiaries was to be effected. The court therefore considered authorities which hold the identity of members of a class to which a gift is made is ascertained as of the date on which the designated ancestor dies. (*Estate of McCallen* (1975) 53 Cal.App.3d 142, 151 [125 Cal.Rptr. 645]; *Estate of Miner* (1963) 214 Cal.App.2d 533, 540 [29 Cal.Rptr. 601]; *Estate of Doyle* (1962) 202 Cal.App.2d 434, 441-442 [21 Cal.Rptr. 123].) The court reasoned that under that rule an adult adoptee would be a "living descendant" of the testator's son at the time the testator's son died even though the adoptee would not have been considered such at

---

[10]It can be argued that when the law changes after a will is executed, but before the testator's death, we should presume that a competent testator would change the will if the new law does not reflect his or her present intent. We need not decide here whether in such circumstances a court should look to the law in effect at the time of a testator's death for the testator's presumed intent because there was no change in the law between the time Lathrop executed her will and the time of her death.

the time the will was executed. Finding that a strong parent-child relationship had been established between a stepchild raised in the family of the designated ancestor, the *Joslyn* court applied the rule that the members of the class are ascertained as of the date of death of the designated ancestor in determining whether the claimant was a descendant. (*Estate of Joslyn, supra,* 38 Cal.App.4th 1428, 1440.)

In the case before this court, Jon E. Newman had been adopted out of the family of Earl Mitchell when Mitchell died in 1993. At that time the class of persons entitled to share Mitchell's income interest in the trust closed. Membership in the class was limited to "issue" of Mitchell in existence at the time of Mitchell's death under the rule applied in *Joslyn*, but class closure rules do not tell us whether Lathrop should be presumed to have intended that Newman be considered "issue" even though Newman was no longer recognized by law as a son of Mitchell.

For the reasons stated above, we do not agree with *Joslyn* that a legislative change in public policy that is enacted subsequent to the death of a testator may fairly be deemed to reflect the intent of the testator. We presume that provisions in a will are made with an understanding of, and an intent to act pursuant to, the law and public policy as it exists when the will is executed. It is more reasonable to assume that a testator who intends a different disposition will make express provision governing the status of adopted children than to assume that the testator intends that their status not be established until some future time and be contingent upon legislative fiat.

The Court of Appeal also relied on subdivision (b) of section 21113, which provides that persons answering the description of a class at the date a future interest is to take effect are included in the class. That section refers to the time the class members are identified, however. It does not state that the law then in effect defines the terms used to describe the class.[11] *Estate of Woodworth* (1993) 18 Cal.App.4th 936 [22 Cal.Rptr.2d 676], and *Estate of Liddle* (1958) 162 Cal.App.2d 7 [328 P.2d 35], on which *Woodworth* relied, construed the term "heirs" as meaning those persons entitled to take by intestate succession whose identities must be determined as of the death of

---

[11]Section 21114 provides that a transfer of a future interest to "heirs," "family," "next of kin," "or words of similar import," of a designated person, transfers the interest to the persons who would be that person's heirs under the law of intestate succession in effect at the time the transfer is to take effect. We need not decide if "issue" is a "term of similar import" under this section, as the section was not enacted until 1994 (Stats. 1994, ch. 806, § 41) and does not apply if a will or its context requires a different distribution. (§ 21101.) As section 21102 explains: "The intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument. [¶] (b) The rules of construction expressed in this part apply where the intention of the transferor is not indicated by the instrument."

the designated ancestor. The court's construction of the term "heirs" was independent of its holding that those persons who met that definition were to be determined as of the date of death of the designated ancestor. (18 Cal.App.4th at p. 943.) *Wells Fargo Bank* v. *Title Ins. & Trust Co.* (1971) 22 Cal.App.3d 295 [99 Cal.Rptr. 464] is to the same effect. There the trial court held that the heirs of the grantor of a life estate with a remainder to the grantor's heirs if other remaindermen died without issue should be determined as of the death of the grantor. The Court of Appeal recognized this as the general rule, but found an exception applicable on the facts of that case. Again, the issue was the date on which class members were to be ascertained, not the meaning of "heirs." (22 Cal.App.3d at pp. 299-300.) *Estate of Ash* (1966) 64 Cal.2d 497, 503 [50 Cal.Rptr. 549, 413 P.2d 149] addressed the date of vesting and involved no change in the law on construction of terms. *Estate of Miner*, *supra*, 214 Cal.App.2d 533, also involved a class gift to heirs and the rule that this designation reflects an intent that the statute of succession is applied as of the date of death of the designated ancestor to determine the class members. There was no change in the statutory definition of heirs between the date the will was executed and the date of death of the designated ancestor. In *Estate of McCallen*, *supra*, 53 Cal.App.3d 142, 152, the court said only that, absent a contrary intent reflected in the will, it was presumed that the testator intended that the will be construed in conformity with the law and policy under which an adopted child had the same status as a natural child. The children had been adopted after the will was executed but the law had not changed. There was no holding that the meaning of "children" or "issue" as used in the will should be determined under a law enacted after the will was executed.

As respondents note, cases concerned with the timing of class closure are not helpful in construing terms that identify the intended class members. Only one of these cases on which the Court of Appeal relied is arguably relevant. That case, *Estate of Wilson* (1924) 65 Cal.App. 680 [225 P. 283], does not support the Court of Appeal. There, the testator left a life estate in property, most of which had been inherited from her husband, to her son with a remainder to his children, or if he died without issue to the testator's " 'heirs, as provided by the laws of the state of California, the same as if [the testator] had died intestate.' " (*Id.* at p. 682.) Under the law at the time the will was executed, the law of intestacy gave all of a decedent's property, regardless of its source, to the decedent's heirs. Several years later the law was changed to provide that property that had been the separate property of a predeceased spouse went to the relatives of the predeceased spouse. Two years after that the son died without issue.

The *Wilson* court concluded that the testator had deliberately adopted the law in existence and presumably known to her *at the time the will was*

*executed.* Absent a contrary intent expressed in the will, the court would not presume that she intended to adopt an unknown, nonexistent statute as the means by which to designate the objects of her gift. (*Estate of Wilson, supra,* 65 Cal.App. 680, 687.) We reach a similar conclusion here.

Relying on out-of-state authority, appellant also argues that a testator should be presumed to know that the law may change after the will is executed and therefore intends to have terms used to identify members of a class construed in light of the law in effect at the time the class closes. (See *Solomon* v. *Central Trust Co. of N.E. Ohio* (1992) 63 Ohio St.3d 35 [584 N.E.2d 1185, 36 A.L.R.5th 873]; *In re Davidson's Will* (1947) 223 Minn. 268 [26 N.W.2d 223, 170 A.L.R. 215]; *Carnegie* v. *First National Bank of Brunswick* (1963) 218 Ga. 585 [129 S.E.2d 780]; *Merson* v. *Wood* (1961) 202 Va. 485 [117 S.E.2d 661].) That is not, and has not been, the rule in this state with regard to adopted children. The rule is that stated in *Heard, Russell* and *Haneberg.* The court will assume that the testator intended the will to be compatible with the law and public policy in effect at the time the will is executed and that, if the testator has a contrary intent, that intent will be made clear in the will. (*Heard, supra,* 49 Cal.2d 514, 522.)

We presume as we must that Lathrop knew the meaning of "issue" and "children" as those terms were understood at the time she executed the will. We also presume that she knew that under former Probate Code section 257, a child adopted out of a sibling's family was not "issue" who would inherit through his or her natural father or mother at that time. Lathrop is presumed to have known that adopted-out children such as Newman would no longer be treated as a child of the natural parent in the eyes of the law and would not be included among the children or issue of her siblings to whom she left interests in the testamentary trust.

### III

#### *Disposition*

The judgment of the Court of Appeal is reversed.

George, C. J., Mosk, J., Werdegar, J., Chin, J., and Brown, J., concurred.

KENNARD, J., Dissenting.—The testator in this case established in her will a testamentary trust. She provided that certain income under the trust should go to the "issue" of her brother and sisters and that the corpus should go to the "children" of her brother and sisters. The testator's brother married and had a son; later, the brother divorced the son's mother. The mother remarried

and her new husband adopted the son. Is the son one of the "issue" of the testator's brother (the son's natural father) for purposes of distributing the trust income? Is the son one of the "children" of the testator's brother for purposes of distributing the trust corpus?

Deciding these two questions is a straightforward process. In seeking the testator's intent, we look to the ordinary meaning of the words "issue" and "children" unless the will or the circumstances under which it was made disclose a different intention by the testator. (Prob. Code, former §§ 105, 106; *Estate of Russell* (1968) 69 Cal.2d 200, 210 [70 Cal.Rptr. 561, 444 P.2d 353].) In this case, there is nothing in the will or the circumstances surrounding it that shows the testator intended the terms "issue" and "children" to carry any meaning other than their ordinary ones. The ordinary meanings of the terms "issue" and "children" include the biological relationship between a child and its natural parents—at least when, as here, the child is born in wedlock and lives with its natural parents for a significant period of time—even if the parents later divorce and the child is then adopted by the new spouse of one of the parents. Therefore, the son in this case is entitled to share in the trust the testator established.

The majority concludes to the contrary that the son was not one of the "issue" or "children" of the testator's brother, his natural father with whom he lived for his first four years. The majority reaches its conclusion by first creating a legal presumption that in the case of adopted children the meanings of the terms "issue" and "children" as used in a will should be determined not by the ordinary meanings of the terms but by applying the intestate succession statutes. In the majority's view, the son is the issue of his natural father only if he could inherit from his natural father's family (including the testator) under the intestate succession statutes. Because at the time of the testator's death the son could not have so inherited, the majority concludes that the son is not one of the "issue" or "children" of his natural father.

The majority's approach ignores the rules of will construction established by the Legislature as well as the previous decisions of this court. At the times relevant to this case, the Legislature had provided that California courts were to use the intestate succession statutes to identify the beneficiaries of a class gift only if the testator had used one of the following terms: "heirs," "relations," "nearest relations," "representatives," "legal representatives," "personal representatives," "family," "nearest (or next) of kin." (Prob. Code, former § 108.) Because "issue" is not one of the terms listed, this court has held that a testator using that term to define a class does not incorporate by reference the class of takers under the intestate succession

statutes. (*Estate of Pierce* (1948) 32 Cal.2d 265, 269-270 [196 P.2d 1].) Rather, when a testator designates a class of beneficiaries by using a term other than those listed in former section 108, we should apply the ordinary meaning of that term, absent evidence of a different intent by the testator. (Prob. Code, former § 105; *Estate of Russell, supra,* 69 Cal.2d 200, 210.)

I

Helen Lathrop made a will one month before her death in 1972 in which she left the residue of her estate to a testamentary trust. Being childless, she left the income of the trust to her five sisters and her brother, Earl Mitchell, subject to this condition: "Provided, however, that if any of them shall be deceased during any part of the term of this trust, leaving *issue* then living, said *issue* shall take the share of income to which the deceased of them would have been entitled if then living . . ." (italics added). Upon the death of the last sibling the trust is to terminate and its corpus is to be distributed "to the *children* then living of my brothers and sisters" (italics added).

Earl Mitchell, the testator's brother, was the father of Jon Newman. According to the parties, Newman was born in 1936 during the marriage of Mitchell and Newman's mother. According to the trustee's verified petition, which the parties do not dispute, Newman lived with his natural parents from his birth until the age of four. Thereafter, Mitchell and Newman's mother divorced, and the latter remarried. Newman was adopted by his stepfather in 1942.

Mitchell, Newman's natural father, died in 1993. After Mitchell's death, Newman settled a lawsuit brought against him by a minor in the State of Washington by assigning a 25 percent share of the trust income to the minor. The latter sought to attach Newman's share of the trust income by filing a petition in the San Francisco Superior Court, which granted the order. Thereafter, trustee Wells Fargo Bank petitioned for instructions pursuant to section 17200 of the Probate Code as to whether Newman was entitled to share in the trust's income as Mitchell's "issue" and whether Newman was entitled to share in the trust's corpus as one of Mitchell's "children." Other beneficiaries, who had not previously participated, appeared in the superior court proceeding opposing the minor's claim that Newman was a beneficiary under the trust. Newman also appeared in the proceeding.

The superior court, in deciding the trustee's petition, concluded that the term "issue" should be defined by reference to the law of intestate succession as it existed at the time the testator executed her will (Prob. Code, former § 257). Applying that law, the superior court ruled that Newman,

having been adopted by his stepfather, was not the issue of his biological father, Mitchell, because Newman would not have inherited from Mitchell had Mitchell died intestate. The Court of Appeal disagreed, and held that the term "issue" should be defined by reference to the law of intestate succession in effect at Mitchell's death when the interest of his "issue" vested. The Court of Appeal remanded the case to the superior court to apply that law. The interested beneficiaries petitioned this court for review.

## II

Testators often identify the recipients of their bounty by describing a class of persons in general terms rather than by individually identifying its members. In this case, Lathrop's testamentary trust identifies the "issue" of her brother and sisters as a class of income beneficiaries and identifies the "children" of brother and sisters as the class of beneficiaries of the trust corpus. The task here is to ascertain whether Newman is a member of either or both classes, that is, whether Newman is the "issue" or one of the "children" of Mitchell, Newman's natural father and the husband of Newman's mother at the time of Newman's birth.

As the majority notes, the goal of this inquiry is to give effect to the intent the testator expressed in the words of the will. (Prob. Code, § 21102, former § 101.) To discern the testator's intent, a court looks to the words of the will and the circumstances in which it was made. (*Estate of Russell, supra,* 69 Cal.2d 200, 210; see also Prob. Code, former § 105.) The words of the will are to be understood in their ordinary sense, unless the will itself or its surrounding circumstances disclose that the testator intended another meaning. (Prob. Code, former § 106; *Estate of Russell, supra,* 69 Cal.2d 200, 210-211.)

The majority asserts that the terms "issue" and "children" are inherently ambiguous whenever a child has been adopted into or out of a family and "the will is not specific with regard to the rights of the adopted child." (Maj. opn., *ante,* at p. 134.) It takes the position, however, that these asserted ambiguities should be resolved not by examining the circumstances surrounding the will to decide which meaning the evidence best supports but by applying a legal presumption that the testator intended that the meanings of those terms be determined by applying the laws of intestate succession. It then focuses on the question of whether to apply the intestate succession laws as they existed at the time of Mitchell's death or those laws as they existed at the time of the making of the will and the testator's death. The majority chooses the latter approach and concludes that Newman is not the issue of his biological father, Mitchell, because Newman would not have

inherited through Mitchell under the intestate succession provisions for adopted children set forth in Probate Code former section 257 (hereafter also referred to as former section 257), the intestate succession law in effect at the time the will was drafted and at the time of the testator's death.

I disagree. In my view, the proper place to begin is by examining the ordinary meanings of the terms "issue" and "children" as they are used in the will. Our statutes as they existed at the time Lathrop's will was drafted and at her death require us to give the terms "issue" and "children" their "ordinary and grammatical sense, unless a clear intention to use them in another sense can be collected, and that other can be ascertained." (Prob. Code, former § 106; see also *Estate of Russell, supra,* 69 Cal.2d 200, 210-212.) (This provision continues in substance today as Probate Code section 21122.)

The ordinary and grammatical sense of the term "issue" encompasses the biological, blood relationship of parent and offspring. (*Estate of Pierce, supra,* 32 Cal.2d 265, 271 [ordinary meaning of "lawful issue" is "offspring of parentage"]; Webster's Third New Internat. Dict. (1961) p. 1201 [defining "issue" as "offspring, progeny . . . : one or more persons descended from a common ancestor"].) Adoption by a stepparent cannot alter or sever this blood relationship.

This court's conclusion in *In re Darling* (1916) 173 Cal. 221 [159 P. 606] supports this understanding of "issue." In that case, A died intestate, A's son B predeceased A, and B's son (A's grandson) C had been adopted out of the family. The intestate succession statute at the time provided that, under the circumstances attending A's death, A's property would go to the "issue" of B. The question in *Darling* was whether, with respect to his grandfather A, C remained B's "issue" notwithstanding his adoption. This court, applying an ordinary understanding of the term "issue," said yes. (*Id.* at p. 226.) Similarly, here Newman, with respect to Lathrop his aunt, remained Mitchell's issue notwithstanding his adoption by his stepfather after his parents' divorce.

Likewise, the ordinary and grammatical sense of the term "children" encompasses the biological, blood relationship of parent and offspring. (Webster's Third New Internat. Dict., *supra,* p. 388 [defining "child" as "a son or a daughter: a male or female descendant in the first degree: the immediate progeny of human parents"].) Again, this relationship is not severed when a stepparent later adopts the child. Therefore, in this case Newman remains Mitchell's child within the ordinary meaning of the term.

Next, I consider whether Lathrop's will uses the terms "issue" and "children" in a related sense, for a relationship established by the will between

different terms that it uses can shed light on the meaning of those terms. Like the majority, I conclude that the meanings of the terms "issue" and "children" are interrelated in this case because of the way Lathrop used them in the will. In addition to distributing the trust income to the "issue" of her siblings, Lathrop's will provides that upon the death of her last-surviving sibling the trust corpus is to be distributed "to the *children* then living of my brothers and sisters" (italics added). I conclude, as does the majority, that in the context of the will as a whole Lathrop intended by her use of the term "children" to distribute the corpus to the first generation of the "issue" of her siblings. (Maj. opn., *ante*, at p. 135.) There is nothing that suggests to the contrary that she intended for any of the first generation of her siblings' "issue" to share in the trust income but not also to share in the corpus as one of the "children," or that she intended for any of her siblings' "children" to share in the corpus but not to share in the income as an "issue."

Thus, the meanings given to those two words as used in the will should be congruent and harmonious with each other. The ordinary meanings that I have discussed above of the terms "issue" and "children" are congruent because, under those meanings, the term "children," designating the first generation of progeny, composes the first generation of "issue." This accords with the will's use of those two terms, for it too uses the term "children" to designate the first generation of "issue."

There is no evidence in the will of a "clear intention" (Prob. Code, former § 106) by Lathrop to use the term "issue" in any but its ordinary sense; the majority so concedes. (Maj. opn., *ante*, at p. 135 ["it seems clear that she used the term 'issue' in its commonly understood meaning"].) Nor is there any evidence in the will of a "clear intention" by Lathrop to use the term "children" in any but its ordinary sense.

Finally, I consider the circumstances under which the will was drafted to see whether these circumstances show that Lathrop intended the terms "issue" and "children," contrary to their ordinary meaning, to exclude Newman, the biological and legitimate son of Lathrop's brother Mitchell. (See Prob. Code, former § 106; *Estate of Russell, supra,* 69 Cal.2d 200, 210-212.) The circumstances under which the will was drafted are these: Mitchell and Newman's mother were married at the time of Newman's birth. Newman lived with Mitchell for four years before his parents divorced, his mother remarried, and he was adopted by his stepfather. A testator in Lathrop's position would ordinarily be aware of the birth of the first child born to her brother and his wife, for such occasions are joyous and cele- brated events in our society. There are no facts suggesting that Lathrop did not know of Newman's birth and existence. Likewise, the ordinary testator

in Lathrop's position would continue to think of her brother's son as his child and issue even after her brother and his wife were divorced. It would be most unusual for such a testator to describe her brother as childless or without issue simply because he had divorced the mother of his child. Nor would such a testator have said her brother was childless, or denied that Newman was her brother's child, once her brother's ex-wife remarried and the new husband adopted her brother's child. The typical testator in Lathrop's position would have continued to think of Newman as her brother's child and issue; nothing suggests that Lathrop did not. Accordingly, the circumstances surrounding the making of the will do not show any intention, much less a "clear intention," by Lathrop to reject the ordinary meanings of the terms "issue" and "children" in favor of some other sense. (See Prob. Code, former § 106; *Estate of Russell, supra,* 69 Cal.2d 200, 210-212.)

For the reasons set forth above, I conclude that Newman is Mitchell's "issue" under the will and is entitled to a share of the trust's income. I also conclude that Newman is entitled to share in the corpus when it is distributed as one of the "children" of Lathrop's siblings.

### III

The majority concludes to the contrary that Newman is not one of the "issue" or "children" of his natural father Mitchell because under former section 257 and the other laws of intestate succession Newman could not have inherited through Mitchell from Lathrop and other relatives of Mitchell after his adoption by his stepfather. The majority's approach is wrong, for it ignores the statutory conditions that the Legislature has established for using the intestate succession laws to determine a class of beneficiaries under a will, as I discuss below.

The laws of intestate succession identify the heirs who take the property of a decedent who dies *without* a will. Decedents who die *with* a will—testators—have also used these laws in drafting their wills to designate a class of beneficiaries. One noted commentator has explained a testator's typical purpose in using the intestate succession statutes to define a class of beneficiaries: "[T]he average testator . . . usually does so after he has exhausted his specific desires as to the beneficiaries of his bounty and he has in effect said, 'Now let the law take its course.'" (5 Casner, American Law of Property (1952) Class Gifts, § 22.57, p. 415.)

For centuries, testators have given property to the class of persons who, in the absence of a will, would inherit from the testator or from someone else under the laws of intestate succession. A testator can do so by expressly

referring to the intestate succession laws; testators have also used various shorthand terms such as "heirs" to implicitly designate the class of persons taking under the intestate succession laws. (See, e.g., *James* v. *Richardson* (1678 K.B.) 83 Eng.Rep. 172, 533, 89 Eng.Rep. 353 [will made in 1657 devising property to "heirs males of the body . . . now living"]; *Davies* v. *Lowndes* (1838 Ex.) 132 Eng.Rep. 872, 875 [will made by testator who died in 1772 leaving property to "right and lawful heir at law"]; *In re Whitcomb* (1890) 86 Cal. 265, 271 [24 P. 1028] [will providing that " 'said remainder shall go to my heirs at law' "].)

Our Legislature has recognized that testators often wish to incorporate by reference the intestate succession laws to designate a class of persons to receive property under a testamentary scheme. To accommodate this desire and to bring certainty to the process of determining whether a testator has implicitly incorporated by reference the intestate succession statutes to designate a class of beneficiaries, the Legislature long ago established a bright-line rule as to which terms were sufficient for that purpose.

When our Civil Code was first enacted in 1872, the Legislature included former section 1334 as one of the rules for the interpretation of wills. Under that section, "[a] testamentary disposition to 'heirs,' 'relations,' 'nearest relations,' 'representatives,' 'legal representatives,' or 'personal representatives,' or 'family,' '*issue*,' 'descendants,' 'nearest' or 'next of kin' of any person, without other words of qualification, . . . vests the property in those who would be entitled to succeed to the property of such person, according to the provisions of the Title on Succession, in this Code." (Civ. Code, former § 1334, italics added.) Thus, under former section 1334, use of the term "issue" in a will to designate a class of beneficiaries under a will did incorporate by reference the laws of intestate succession.

In 1931, however, 41 years before Lathrop's will was drafted, the Legislature enacted a new Probate Code. Among other changes, the Legislature revised former section 1334 of the Civil Code and recodified it as section 108 of the Probate Code (hereafter former section 108). In its 1931 revision and recodification of former section 108, the Legislature omitted "issue" from the list of terms that, under our rules of construction, incorporate by reference the laws of intestate succession. "A testamentary disposition to 'heirs,' 'relations,' 'nearest relations,' 'representatives,' 'legal representatives,' 'personal representatives,' 'family,' 'nearest (or next) of kin' of any person, without other words of qualification, . . . vests the property in those who would be entitled to succeed to the property of such person, according to the provisions of division II of this code [i.e., the intestate succession statutes]." (Former § 108.) Former section 108 was in effect at the time

Lathrop's will was drafted and at the time of her death. Since those events, it has been recodified twice; it continues in substance as Probate Code section 21114 and continues to omit "issue" from the list of terms that incorporate by reference the laws of intestate succession.

Nearly 50 years ago, this court recognized that the Legislature's deliberate omission of "issue" from the terms listed in former section 108 meant that a testator's use of the term "issue" to designate a class of beneficiaries no longer incorporated by reference the intestate succession laws. As Justice Roger Traynor explained: "Before its amendment in 1931 this section [i.e., former section 108] also included the term 'issue.' This amendment clearly indicates that the statute of succession was *not* to control the interpretation of the term 'issue' as used in a will." (*Estate of Pierce, supra,* 32 Cal.2d 265, 269-270, italics added.)

Thus, a competent practitioner drafting Lathrop's will in 1972 would have known that under our statutes of construction the word "issue" did not incorporate by reference the laws of intestate succession, and that if Lathrop wished to designate the class of those who would take from her siblings under the laws of intestate succession she would have to use one of the words specified in former section 108, such as "heirs," or else set forth an express description of the class as consisting of those taking under the intestate succession laws. "When statutes like section 108 are not applicable, the rules of intestate succession apply only if the testator expresses an intention in the will to adopt such rules." (*Estate of Pierce, supra,* 32 Cal.2d 265, 270.) Here, Lathrop expressed no such intention in her will; therefore, the laws of intestate succession do not govern the interpretation of the term "issue" in this case.

In reaching its contrary conclusion that the meaning of "issue" as used by Lathrop should be determined by looking to the laws of intestate succession, the majority ignores former section 108, the statute I discussed in detail above. Instead, the majority begins its analysis by citing a principle of will construction that, whatever its general validity, has no application here. The majority states as follows: "A testator is presumed to be aware of the public policy reflected in the statutory definitions of the terms used in a will at the time the will is executed and to intend that those definitions be followed in construction of the will unless a contrary intent is expressed in the will. This presumption is strongest when an attorney has drafted the will because '[w]here an instrument has been drawn by one skilled in the law, the presence of legal and technical terms is an indication that the legal term of art has been used, and therefore is to be accepted, in accordance with its legal definition. [Citations.]' " (Maj. opn., *ante,* at p. 136.)

This principle is irrelevant here because there is no applicable statutory definition of the term "issue" and it is not a legal term of art. Former section 257, the intestate succession statute addressing adopted children on which the majority relies, nowhere uses the term "issue" and does not purport to define it, much less define it to exclude adopted-out children.[1] Former section 257 establishes who are takers of the decedent's property when there is no will, not who are "issue" when that term is used in a will. In addition, as I explained earlier, former section 108 was expressly revised to *delete* "issue" from the list of terms it defined as incorporating the laws of intestate succession, showing the Legislature's intent that "issue" not be defined by reference to the intestate succession statutes. (*Estate of Pierce, supra,* 32 Cal.2d 265, 269-270.)

Nor is "issue" a legal term of art that at the time Lathrop made her will and at the time of her death had a settled technical legal meaning excluding adopted-out children. This court similarly noted in *Estate of Pierce, supra,* 32 Cal.2d 265, 270, that our cases and statutes "do not purport to prescribe a standard meaning for the term[] . . . 'lawful issue' as used in wills or other private instruments, and are therefore not controlling in the interpretation of wills or other private instruments." (See also 5 Casner, American Law of Property, *supra,* Class Gifts, § 22.2 at p. 246 ["The words 'heirs,' 'heirs of the body,' 'next of kin' and the like are fundamentally different from the words 'children,' 'grandchildren,' 'issue,' etc., in that they are technical words that have no meaning today independently of a statute on the intestate succession of property."].)

The majority rests its conclusion that "issue" should be defined with reference to the intestate succession provisions of former section 257 on a decision of this court, *Estate of Heard* (1957) 49 Cal.2d 514 [319 P.2d 637]. In *Heard*, a testator's testamentary trust named as beneficiaries her son or the latter's "lawful issue." (*Estate of Heard, supra,* 49 Cal.2d 514, 516.) The son adopted a child and then died; the question in *Heard* was whether the meaning of "lawful issue" included both natural and adopted children. (*Id.* at p. 517.) This court concluded that the growing social acceptance of adoption, under which adoptive and natural children were viewed as equals in every respect and which was reflected in the adoption laws and a whole range of

___

[1] At the time Lathrop's will was drafted and at the time of her death, former section 257 provided: "An adopted child shall be deemed a descendant of one who has adopted him, the same as a natural child, for all purposes of succession by, from or through the adopting parent the same as a natural parent. An adopted child does not succeed to the estate of a natural parent when the relationship between them has been severed by adoption, nor does such natural parent succeed to the estate of such adopted child, nor does such adopted child succeed to the estate of a relative of the natural parent, nor does any relative of the natural parent succeed to the estate of an adopted child."

other statutes, had enlarged the ordinary understanding of "lawful issue" to encompass not only biological parent-child relationships but also adoptive parent-child relationships. (See *id.* at p. 518 [referring to the " 'fundamental social concept that the relationship of parent and child, with all the personal and property rights incident to it may be established, independently of blood ties, by operation of [adoption] law' "].)

Contrary to the impression created by the majority, the *Heard* court did not determine the meaning of "lawful issue" by asking, as the majority does here, whether the adopted child could have inherited from the testator under the law of intestate succession set forth in former section 257 had the testator died intestate. Rather, the *Heard* court noted that under the intestate succession laws as they existed at all relevant times (the time the will was executed, the time of the testator's death, and the time of the death of the testator's son), the adopted child in question could *not* have inherited from the testator had she died intestate. (*Estate of Heard, supra,* 49 Cal.2d 514, 522.) This was because, prior to the 1955 amendment of section 257, an adopted child could inherit from an adoptive parent but not from the intestate relative of an adoptive parent. (*Estate of Calhoun* (1955) 44 Cal.2d 378, 384 [282 P.2d 880].)

The *Heard* court nonetheless held that the intestate succession statutes were not controlling "here where we are concerned not with inheritance but rather with whether the words 'lawful issue' used in a will includes [*sic*] an adopted child." (*Estate of Heard, supra,* 49 Cal.2d 514, 522.) Thus, the *Heard* court concluded that the adopted-in child in that case was within the meaning of the term "lawful issue" and was entitled to receive property under the will even though under former section 257 and the other intestate succession laws the child could not have inherited from the testator. (49 Cal.2d at pp. 522-523.) In this case, I similarly conclude that the intestate succession statutes do not control the meaning of "issue" and "children" as used in Lathrop's will here, and that Newman, the biological and legitimate son of Lathrop's brother, is within those two classes of beneficiaries even though Newman, after his adoption by his stepfather, could not inherit from Lathrop under the intestate succession laws.

There are other reasons as well why *Estate of Heard, supra,* 49 Cal.2d 514, does not support the majority's conclusion. As I have noted above, the question in *Heard* was whether the social and legal acceptance of adoption had expanded the meaning of the term "lawful issue" to encompass adopted children as well as biological children. In this case, there is no basis for contending that the social acceptance of adoption has *contracted* the ordinary understanding of "issue" or "children" so that those terms no longer include

the biological parent-child relationship existing between Newman and Mitchell. Nor, in contrast to the policy that *Heard* relied upon of encouraging the treatment of natural and adopted children as equals in every respect, including in the making of testamentary gifts, is there any public policy that precludes the relatives of a natural parent from leaving gifts to a child adopted out of the family in a stepparent adoption.

Moreover, it is important to keep in mind that a principal reason a testator drafts a will is to *escape* the intestate succession laws, not to advance them. A decedent wishing to adhere to the policies and distributional scheme of the intestate succession statutes has no need of a will, but can simply let the law take its course. Thus, in the absence of a statutory presumption on the order of former section 108, a court should not conclude that a testator has implicitly and unspokenly adopted the intestate succession statutes as the testator's plan of distribution unless there is evidence that the testator intended to do so. (*Estate of Pierce, supra,* 32 Cal.2d 265, 270 ["When statutes like section 108 are not applicable, the rules of intestate succession apply only if the testator expresses an intention in the will to adopt such rules."]; see also Prob. Code, former § 106 [requiring us to interpret terms in a will in their ordinary sense unless testator has manifested a "clear intention" to use them in another sense].) Here there is none.

With respect to the two Court of Appeal decisions that the majority relies on, those decisions have little persuasive force, for in concluding that the meaning of "issue" is determined by the intestate succession laws they each ignore completely the contrary teachings of former section 108 and this court's decision in *Estate of Pierce, supra,* 32 Cal.2d 265. (*Estate of Russell* (1971) 17 Cal.App.3d 758 [95 Cal.Rptr. 88]; *Estate of Haneberg* (1971) 19 Cal.App.3d 643 [96 Cal.Rptr. 807].) In addition, they misread *Estate of Heard, supra,* 49 Cal.2d 514, in the same manner that the majority does, and they do not address any of the flaws of that misreading that I have set forth above.

#### CONCLUSION

At the time the will of the testator in this case was drafted, testators who wished to incorporate Probate Code former section 257's rules of succession excluding adopted-out children had a ready avenue for doing so. They had only to use one of the following statutorily designated terms to define a class of beneficiaries: heirs, relations, nearest relations, representatives, legal representatives, personal representatives, family, nearest (or next) of kin. (Former section 108.) The testator here did not do so. Nor is there any indication in the will or its surrounding circumstances that the testator

otherwise intended to use the terms "issue" and "children" to mean something other than their ordinary meanings.

Accordingly, the ordinary meaning of the words "issue" and "children" govern. Those meanings encompass children like Newman who are born into a marriage and who, after the marriage ends, are later adopted by a stepparent, for even after adoption such children remain the progeny of their biological parents.

For the reasons stated above, I would reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.